UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                          S2 15 Cr. 706 (VSB)

SHIWEI YAN, a/k/a "Sheri Yan,"

                          Defendant.


**DEFENDANT SHIWEI ("SHERI") YAN'S SENTENCING MEMORANDUM**


QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Christine H. Chung
Samantha Gillespie
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

CLAYMAN & ROSENBERG LLP
Isabelle A. Kirshner
305 Madison Avenue, Suite 1301
New York, New York 10165
(212) 922-1080

*Attorneys for Defendant Shiwei Yan*

July 11, 2016

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................3

A.     Ms. Yan's Personal History and Characteristics..................................................3

     1.     Ms. Yan's Personal History ......................................................................4

     2.     Ms. Yan's Characteristics .........................................................................8

     3.     The Effects of the Prosecution on Ms. Yan ...........................................13

B.     The Nature and Circumstances of the Offense ...................................................15

C.     The Sentencing Guideline Range........................................................................29

D.     The Sentence Sufficient to Serve the Purposes of Punishment ..........................35

E.     The Types of Sentences Available.......................................................................42

F.     The Need to Avoid Disparate Penalties...............................................................42

G.     The Need to Provide Restitution..........................................................................43

CONCLUSION...................................................................................................................44

# TABLE OF AUTHORITIES

**Page**

## Cases

*Gall v. United States*,
    552 U.S. 38 (2007)..................................................................42

*Graham v. Florida*,
    560 U.S. 48 (2010)....................................................................2

*McDonnell v. United States*,
    No. 15-474, 597 U.S. ___, 2016 WL 3461561 (June 27, 2016)...........................20

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)...................................................3

*United States v. Booker*,
    543 U.S. 220 (2005)..................................................................31

## Rules / Statutes

18 U.S.C. § 201...........................................................................20

18 U.S.C. § 3553 ................................................................. *passim*

18 U.S.C. § 666......................................................................19, 31

U.S.S.G. § 2B1.1.........................................................................19

U.S.S.G. § 2C1.1....................................................................29, 35

U.S.S.G. § 2T1.1....................................................................42, 43

U.S.S.G. § 2T4.1.........................................................................42

U.S.S.G. § 3E1.1....................................................................30, 43

U.S.S.G. Part A, Sentencing Table ..................................................30, 43

## Other Authorities

Black Tie Magazine, *Sheri Yan at the United Nations Headquarters*, YouTube,
https://www.youtube.com/watch?v=7TWCJfKsWEc&app=desktop (last visited July 10,
2016) ....................................................................................................................22

Hon. Raymond Dearie, *Retool Mandatory Sentences*, New York Law Journal (June 24, 2016),
http://www.newyorklawjournal.com/id=1202760853093/Retool-Mandatory-
Sentences?mcode=0&curindex=0&curpage=1 ....................................................................41

Hon. Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should be Scrapped*,
26 Fed. Sent. R. 6 (2013) ...........................................................................................31

Statement from the Family of H.E. John William Ashe (June 24, 2016),
*available at* http://antiguaobserver.com/wp-content/uploads/2016/06/June-24-FAMILY-
STATEMENT-ON-THE-PASSING-OF-AMBASSSADOR-ASHE.pdf...............................36

U.N. Secretary-General's Task Force, *Rep. on the Functioning of the Office of the President of
the General Assembly*, U.N. Doc. A/70/783 (Mar. 23, 2016),
http://www.un.org/pga/70/wp-content/uploads/sites/10/2015/08/29-MarAHWG-
Revitalization-29-March-2016.pdf  ..............................................................................27, 28

U.N. Office of Internal Oversight Servs., *Audit of the Management of the Trust Fund in Support
of the Office of the President of the General Assembly*, Rep. 2016/022 (Mar. 22, 2016),
https://oios.un.org/page/download/id/474...............................................................27, 28, 29

U.N. Office of Internal Oversight Servs., *Audit of the U.N. Secretariat's Engagement with
Selected Non-Governmental Organizations and a Related Entity*, Rep. 2016/021 (Mar. 22,
2016), https://oios.un.org/page/download/id/473 ................................................................27

Press Release, U.S. Attorney's Office, S.D.N.Y., Manhattan U.S. Attorney Charges 11 With
Operating Massive Day Care Fraud And Bribery Scheme, https://www.justice.
gov/archive/usao/nys/pressreleases/August10/operationpaycaretakedownpr.pdf ..................33

U.S. Sentencing Comm'n, 2015 Sourcebook of Federal Sentencing Statistics, Comparison of
Sentences Imposed and Position Relative to the Guideline Range by Circuit (Tbl. N-2)
(2015), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-
reports-and-sourcebooks/2015/TableN-2.pdf .......................................................................32

U.S. Sentencing Comm'n, 2015 Sourcebook of Federal Sentencing Statistics, Sentences Relative
to the Guideline Range by Each Primary Offense Category (Tbl. 27A) (2015),
http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-
sourcebooks/2015/Table27a.pdf .............................................................................................32

U.S. Sentencing Comm'n, *Alternative Sentencing in the Federal Criminal Justice System* (Jan.
2009), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
projects-and-surveys/alternatives/20090206_Alternatives.pdf...............................................41

Defendant Shiwei (Sheri) Yan, by and through undersigned counsel, respectfully submits this Sentencing Memorandum to aid the Court in its determination of a fair and just sentence. Sentencing in this case is set for July 26, 2016 at 10:00 a.m.

## <u>INTRODUCTION</u>

This past January, Sheri Yan pled guilty to a superseding Information that charged her with a single Count of bribing John Ashe, while he was either the Permanent Representative of Antigua to the United Nations or the President of the United Nations General Assembly.  In doing so, and agreeing to forfeit $300,000, Ms. Yan took full responsibility, early in her court case, for an unfortunate and uncharacteristic episode in an otherwise law-abiding life.  Ms. Yan, who is 60 years old, and became a naturalized U.S. citizen after emigrating to the United States at the age of 32, is by all accounts a loving and generous person who thrives by helping others and is incapable of intentionally hurting anyone.  Her life should have been lived lawfully and in obscurity.  Ms. Yan veered instead into paying money to John Ashe, and public infamy, because of the intersection of two circumstances.  First, Ms. Yan disastrously aspired to making money through "deal making," though she had little in the way of relevant skills other than in ventures in China.  Second, Ms. Yan was introduced to Mr. Ashe, a public official who traded on his high-profile office relentlessly, not solely with Ms. Yan, and whom the government nonetheless never even sought to hold accountable for bribery.

Every sentencing factor identified by Section 3553(a), with the sole exception of the Guidelines, calls for a minimal term of incarceration—if any.  Ms. Yan has never before and will never again commit a crime.  The public does not need to be protected from her.  Ms. Yan's remorse for her crime is profound; most devastating to her is that she has shamed herself before her daughter, Victoria, a junior at Wellesley College, her husband Roger, a long-time official of the Australian government, and her aging and infirm parents in China.  In addition, while Ms.

Yan quickly owned up to the seriousness of her own failings, and is facing the dire consequences of the exposure of her misdeeds to her family and to the world, her crime did not, in the end, inflict injury.  Mr. Ashe—the hub of the two schemes alleged in the broader case—was the leader and instigator who lined his pockets.  The United Nations has admitted that its own "significant loopholes and blindspots" made it possible for Mr. Ashe to route millions to bank accounts, established by himself personally, that were outside of any United Nations or U.N. General Assembly oversight.  And the government of Antigua and Barbuda, whose officials were purportedly "corrupted" by the money Ms. Yan channeled to Mr. Ashe, has stated that it regards the actions of Mr. Ashe to have been "in the interest and for the good of Antigua and Barbuda."

Ms. Yan, in other words, has uniquely and profoundly accepted responsibility, although there is an abundance of "shared blame," and Ms. Yan did not profit, unlike Mr. Ashe and his Antiguan colleagues.  The sentence that is "sufficient, but not greater than necessary" to comply with the penological objectives of Section 3553(a), *see Graham v. Florida*, 560 U.S. 48, 50 (2010) (identifying "retribution, deterrence, incapacitation, and rehabilitation"), is far less than the Guidelines sentence of 70-87 months' imprisonment—an advisory term that is largely a function of the single factor of the value of the payments to Mr. Ashe made by Ms. Yan.  Ms. Yan's deepest wish is to return to obscurity, to drop out of "business" affairs, and to have the chance to physically embrace her parents again during their remaining time.  She respectfully entrusts her fate to the Court and requests fairness and mercy.

## ARGUMENT

Because the facts and circumstances relating to this sentencing are numerous, this submission will be organized around the seven Section 3553(a) factors.  The Guidelines are one of those factors, and Ms. Yan and the government agreed to a Guidelines range that would serve the customary advisory purpose.  The other factors that the Guidelines expressly do *not* take into account will also be addressed.  Therefore, the remainder of this Memorandum proceeds as follows:

- Ms. Yan's Personal History and Characteristics

- The Nature and Circumstances of the Offense

- The Guidelines Sentencing Range

- The Sentence Sufficient To Serve the Purposes of Punishment

- The Types of Sentences Available

- The Need To Avoid Disparate Penalties

- The Need To Provide Restitution

### A.    Ms. Yan's Personal History and Characteristics

The primary factors to be considered in crafting a sentence are the "nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Because there has been no trial of Ms. Yan nor her purported co-conspirators, this submission describes the nature and circumstances of the offense, in the next Section.  We first, however, address Ms. Yan's history and character.  As was explained in *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), the focus upon the history and characteristics of the defendant stems from the "elementary principle of weighing the good with the bad," and assessing "immediate misconduct . . . in the context of [the defendant's] overall life

hitherto," particularly "at the moment of [the defendant's] sentencing, when [her] very future hangs in the balance."

### 1.    Ms. Yan's Personal History

Ms. Yan's biography is unusual and bears on the circumstances of her offense and the punishment and hardship she faces and has already experienced.  Ms. Yan was born in Anhui province in China in 1955 as a second child; her father is a painter and poet, now aged 86, and her mother, age 84, is a retired editor and news broadcaster.  While Ms. Yan has always enjoyed an extremely close relationship with her family, in 1966, the Cultural Revolution forcibly separated Ms. Yan and her brother from their parents.  Ms. Yan's mother and father were taken away and forced into labor, or "re-education," and Ms. Yan and her brother lived on their own, with sporadic chances to see their mother and father.  Like other children did at the time, and to gain the means of feeding and supporting herself, Ms. Yan joined a dance troupe at the age of 15 that was sponsored by the Red Army.  Ms. Yan's family was not reunited until six years later, in 1976.

Ms. Yan never completed a high school education.  Beginning in 1980, when she was 25, she studied in journalism programs in Beijing that did not require a high school diploma.  In 1987, she emigrated to the United States.  When Ms. Yan left China, she had $400 that her mother had sewn into her clothes.  She did not know English.  She began living in Washington, D.C., supporting and housing herself by working as a live-in nanny and home attendant, attending English classes, and getting a job within a few years as an assistant at a news services company.

Ms. Yan still considers Washington, D.C., one of her homes; she also met her husband there, in 1989, in a bookstore.  Roger Uren, who is an Australian citizen, was a long-time

diplomat with the Australian Foreign Service who at the time was posted to the Australian Embassy in Washington, D.C.  The couple were married in 1994, and their first and only child, Victoria, was born the following year.  The couple's marriage took place in Arlington, VA, and Ms. Yan also bought an apartment there, which she still maintains, although it has been vacant or rented since 2001.  Ms. Yan also became a naturalized U.S. citizen that same year.

Ms. Yan held her only salaried job at an established company from 2001 to 2008.  The company, called eChina Cash, was based in the United States but also operated in China, and Ms. Yan and her daughter Victoria re-located to Beijing in 2001.  The business of eChina Cash, where Ms. Yan began as a senior assistant to the President and worked her way up to becoming co-CEO, was to run customer loyalty programs for a Chinese company that operated retail gas stations in China.  Ms. Yan was successful at the job, and it ultimately brought her a steady and healthy income of about $200,000 per year.  Peter Norton, the individual behind Norton Anti-Virus computer security programs, was an investor in eChina Cash, as well as Chairman of the Board.  He has written to the Court, on behalf of Ms. Yan, that he knows Ms. Yan from those years as a "smart, capable and healthy person."  Ex. 1 (Letter of Peter Norton).[1]

The eChina Cash job also, however, brought stress and anxiety to Ms. Yan's family and personal life.  Her husband Roger left his long service in the Australian government and re-located to Hong Kong to work for a company called Phoenix TV.  The family became a commuting family.  Victoria, who attended grade school in Beijing while being babysat by an "ayi" and Ms. Yan's parents, recalls her mother's absences and busy work schedule.  *See* Ex. 1 (Letter of Victoria Uren).  This was also when Victoria began realizing that her mother was

---

[1]  "Ex." refers to the Exhibits attached to this Memorandum.  The letters submitted in support of Ms. Yan are attached to this Memorandum as Exhibit 1, Parts A and B, and will be referred to herein as "Letter of [Author's Name]."

primarily supporting her and also constantly striving to "make something" of herself in others'

eyes, particularly those of her young daughter.  *See id.*  Ms. Yan was focused—unhealthily, in

Victoria's estimation today—on raising her own stature of herself and giving every possible

advantage to her daughter.  *See id.*

Ms. Yan agreed with her husband that they should relocate so that the family could live

in Canberra, Australia, together, in 2008.  In Ms. Yan's working life, this began a period in

which Ms. Yan started companies to provide consulting services to Australian or other non-

Chinese companies who wanted to do business in China.  In these efforts, Ms. Yan partnered

with her co-defendant Heidi Hong Piao, a U.S. citizen born in China and of Korean descent, who

attended college and graduate school in China and the United States.  Ms. Piao had become like

a sister to Ms. Yan after Ms. Yan hired her to work at eChina Cash.

Ms. Yan's contributions to these consultancies were three-fold.  First, Ms. Yan spoke and

wrote Mandarin fluently and spoke English adequately, and she had been raised in China and

spent seven years working at a successful business start-up in Beijing.  Second, as a result of her

Chinese work experience and her husband's friends and connections in Australia, she met and

knew prominent people in business, in both China and Australia, who had interests in cross-

border business ventures or knew people with such interests.  Third, and as many of the two

dozen letters submitted in support of Ms. Yan attest, Ms. Yan has considerable interest in

"putting people together" and is adept at socializing and hostessing.  Her skills were mainly

social, not professional, but Ms. Yan tried to draw on them in her new ventures.

Ms. Yan and Ms. Piao had some successes in their consultancies, particularly in

introducing potential business partners, including people of prominence.  But not many ventures

succeeded beyond the exploratory stage, and Ms. Yan never earned as much as she had when she

left her salaried job at eChina Cash.  As the Complaint that initiated this case described, it was in

early 2012 that Ms. Yan first crossed paths with Mr. Ashe, in Hong Kong.  *See* Compl. ¶ 44.  At

that time, Mr. Ashe was touting that he was likely to be elected to be President of the U.N.

General Assembly for the 2013-14 term.  *See id.*  At his first meeting with Ms. Yan and Ms.

Piao, he offered to make them "advisors" to the President of the General Assembly.[2]  He also

immediately began seeking from them, and others, contributions to help fund his term as

President, *see* Compl. ¶ 44, and saying (correctly) that the United Nations did not prohibit

private entity contributions to that Office.[3]

The move that Ms. Yan made back to the United States, and the payments that Ms. Yan

and Ms. Piao made to Mr. Ashe, are discussed below as part of the "nature and circumstances of

the offense."  Suffice it to say that it was disastrous for Ms. Yan to apply her desire to help

people through "bringing people together" to set up business ventures, outside of China and

through the connections of a man who was simultaneously a prominent public official and an

active seeker of payments for brokering business deals.

---

[2]  *See* Ex. 1 (Letter of Sheri Yan); *see also* Email from Mr. Ashe to Ms. Yan, copying Ms. Piao (July 18, 2012) (attaching written offer to join his Cabinet when elected President of the General Assembly as a "Senior Adviser" and referencing his "earlier verbal offer").

Although Ms. Yan has no objection to the public filing of her own emails, because the emails reference non-parties we have not attached them to this Memorandum and are submitting them *in camera* to the Court in the first instance.  We are also providing the emails referenced herein to the government.

[3]  *Cf.* Email from Mr. Ashe to Ms. Piao, copying Ms. Yan (Apr. 11, 2013) (Mr. Ashe stating to Ms. Yan and Ms. Piao that because he had "fallen somewhat behind" in his preparations to become the President of the General Assembly, he would have to approach "the more traditional donors that are UN member States").  The fact that the United Nations and the U.N. General Assembly permitted Mr. Ashe to receive donations from States and individuals into an unaudited trust fund is discussed *infra* at 26-29.

### 2.    Ms. Yan's Characteristics

Two dozen people have written letters to the Court to request that the Court show leniency to Ms. Yan at sentencing and to vouch that Ms. Yan will feel deeply, and reward, any leniency shown to her.  The letters have been written by individuals who have encountered Ms. Yan at the different stages in her life:  a friend from Chinese nursery school, girlfriends from Ms. Yan's first years in the United States, her former sister-in-law, co-workers at eChina Cash, former members of the Australian government who knew Ms. Yan through her husband, entrepreneurs and businessmen who met Ms. Yan in China or Australia and/or engaged Ms. Yan to do consulting work, members of Mr. Uren's or Ms. Yan's family, Ms. Yan's daughter Victoria, and Victoria's best friend.  All of the individuals who have written to the Court are well aware, from Ms. Yan and her family, and from the media, of the circumstances of Ms. Yan's crime and her plea of guilty.

As a body, the letters establish first and foremost that Ms. Yan is loved.  Many from all corners of Ms. Yan's life have taken the time and care to share their anecdotes, entreaties, and evaluations with the Court, and the warmth and concern that the letter writers feel for Ms. Yan is out of the ordinary, even given the poignancy of the moment of sentencing.  Many of the letter writers recall times when Ms. Yan was generous or understanding when they or someone they knew were suffering or needy.  Thus it appears that the warmth that the letter writers give to Ms. Yan is a reflected glow:  the sympathy and care-taking that Ms. Yan has given or furnished to her friends and family, in other times, is being returned to her now, when she is herself gravely in need of support.

The traits that are mentioned again and again in the letters are Ms. Yan's big heart, her generosity and selflessness, her charm and humility, and her devotion to her elderly parents and

her daughter.  The letter writers attest, in sum, that Ms. Yan is a good person of good character—

and honest character—who made disastrously bad choices which cause her to be before the

Court for judgment.

A progression in the letters assessing Ms. Yan's character is also striking.  In the letters

about Ms. Yan's earlier years, Ms. Yan is described as a person who is instinctively caring,

good-hearted, and generous.  For example:

- Geling Yan, a prominent and award-winning Chinese novelist and screenplay
  writer, who has been a friend of Ms. Yan's since childhood, recalls that when they
  were in nursery school together, and food was scarce, Ms. Yan would share food
  rationing coupons doled to her own family to children whose families were poorer
  than her own.  According to Geling Yan, Ms. Yan's elders were never able to scold
  Ms. Yan enough to change Ms. Yan's nature, "which is full of goodness and
  compassion."  Although Geling Yan lives in Germany today, she visited Ms. Yan in
  New York just before Ms. Yan pled guilty and has been instrumental in enabling
  Ms. Yan to fund her legal defense.  Ex. 1 (Letter of Geling Yan).

- Yabin Yu, who has known Ms. Yan since she was ten years old, and was the
  sister of Ms. Yan's first husband, has written that Ms. Yan "pours out her heart that
  is full of love" to her family, and describes multiple points in her life when Ms. Yan
  cared for, and financially supported, Ms. Yu or her family, or friends or colleagues.
  These included Ms. Yan arranging a job for Ms. Yu at eChina Cash in Beijing, after
  Ms. Yu had lost her job, and Ms. Yan contributing part of her eChina Cash salary to
  a co-worker diagnosed with stomach cancer.  Ms. Yan also saved the job and
  insurance benefits of the same co-worker.  According to Ms. Yu, Ms. Yan has since
  lost touch with the cancer survivor, but the episode showed Ms. Yu and her family
  and co-workers that Ms. Yan is a "sincere and selfless individual, never with any
  intention of hurting anyone."  Ex. 1 (Letter of Yabin Yu).

- Danny Xiao, another person who became a colleague of Ms. Yan's at eChina
  Cash after Ms. Yan offered a job to him, states succinctly, "[Sheri] helps people
  when they need it and she enjoys doing that."  He regards as an example of Ms.
  Yan's generosity the fact that "[w]hen she was at work, she always listened to the
  young workers who are lacking experiences/skills.  She would share her own stories
  and give them advice[] so that they could actually learn things from their jobs."  Mr.
  Xiao writes: "She shows her love and passion in her life in every detail."  Ex. 1
  (Letter of Danny Xiao).

- Ms. Yan's parents, Zhen Yan and Yingmin Zhu, have written that Ms. Yan was
  an unusually self-less child who preferred distributing treats to friends to enjoying
  them alone, and who was forced by the Cultural Revolution to undertake such grim

tasks as making warm socks that her father could wear when he was sent to perform hard labor.  Ms. Yan's parents also recalled that after Mildred O'Bear, the woman in Washington, D.C., for whom Ms. Yan worked as an in-home caregiver, was admitted to a senior home, Ms. Yan visited her every week.  According to Ms. Yan's parents, in her early years in the United States, when Ms. Yan lived with Ms. O'Bear, Ms. Yan came to treat Ms. O'Bear with as much care as if Ms. O'Bear was an additional parent of her own.  Ex. 1 (Letter of Zhen Yan and Yingmin Zhu).

- Lesley Pang, who first met Ms. Yan in 1993 in the United States, and now works at Fairfax County Public Schools as a Database Engineer, describes how Ms. Yan became like a "dear sister," as the two befriended each other during Ms. Yan's time in Washington, D.C., and later in Beijing.  Ms. Pang states that "No matter who the person is—a company's low-level employee or the doorman in her apartment – she always has respect for them, always has kindness for them."  Ex. 1 (Letter of Lesley Pang).

- Lawrence Walker, a retired Foreign Service Officer of the U.S. Department of State, has written about the romantic matchmaking that Ms. Yan engaged in to arrange for Mr. Walker and Geling Yan to meet:  an effort that resulted in a marriage that has lasted now 23 years.  According to Mr. Walker, when several years ago, he and his wife reminisced in Ms. Yan's presence about the hours of cajoling she did to ensure that Mr. Walker and Geling Yan would go through with their first date, they found that Ms. Yan only vaguely remembered having been involved.  Mr. Walker's conclusion was that "Sheri has done so many good things for so many people over the years that she cannot keep track of it all, nor does she even try."  Ex. 1 (Letter of Lawrence A. Walker).

After Ms. Yan married and moved back to China and later to Australia, her circle of friends grew to include relatives and friends of her husband and people that she met through her own work.  Equally in the eyes of the letter writers regarding this later period—many of whom are extremely accomplished and sophisticated individuals—Ms. Yan is a good and caring person, and also by nature and character an honest and upstanding one.  For example:

- Neil Brown, an Australian Queen's Counsel, arbitrator of the American Arbitration Association, and former Member of the House of Representatives in the Parliament of Australia, has written that he has known Ms. Yan since about 1991-92 and has "always found her to be of good character."  Mr. Brown states that as a former Minister in Australia's government, in charge of departments including the Attorney General's department, he does "not give references lightly" and believes, based on having known Ms. Yan and worked with her in 1992 on a project in Northeastern China, that she conducted herself "in accordance with the highest

proprieties" and aimed to act "properly and lawfully at all times."  Ex. 1 (Letter of
The Honorable Neil Anthony Brown, QC).

- Robert Dean, an aerospace industry executive and former senior U.S. government
  official, hired Ms. Yan to work as a consultant for his company, Ball Corporation,
  in China in 1997.  He found Ms. Yan to be "effective, hard-working, impeccably
  honest, and loyal."  He also notes that Ms. Yan and her daughter share "a natural
  instinct for service to humanity, and for beneficial causes that really help less
  fortunate people."  Mr. Dean predicts that Ms. Yan will emerge from the hardships
  that she now faces "as the fine person she has always been," and that any leniency
  shown to Ms. Yan "will be deeply felt."  Ex. 1 (Letter of Robert Dean).

- Bruce Dover is the Managing Director of DCI Media Group, an international
  media consultancy group, and former CEO of Australia Network, the Australian
  government's international satellite broadcasting service.  Mr. Dover writes that he
  has known Ms. Yan since 2006 and has socialized with Ms. Yan and her family,
  and also that he engaged Ms. Yan, while at Australia Network, on multiple
  occasions as a consultant to further the Network's interests in China.  Mr. Dover
  found that Ms. Yan "always conducted herself with probity and concern for [her
  client's] interests" and "appeared to be driven by a desire to help instigate better
  understanding and improved relations between the Australian and Chinese people."
  According to Mr. Dover, Ms. Yan was a "skilled and successful networker inside
  the Chinese political and business landscape" but may have had "a significant
  naivety," despite "her exposure to Western culture," about "the way the Western
  legal system operates and how differentiated it is from the Chinese environment
  where she operated so effectively."  Mr. Dover describes Ms. Yan as "extremely
  remorseful for her wrongdoing" and notes that Ms. Yan has experienced "great
  shame" as a result of the widespread knowledge of her crime.  Ex. 1 (Letter of
  Bruce Dover).

- Thomas Keneally, an Australian novelist and the author of Schindler's List, has
  written that he first met Ms. Yan through her husband.  He describes Ms. Yan as a
  "warm, friendly and hospitable woman" who hosted him at her apartment in
  Beijing, and whose father is a "renowned" artist and poet in China.  Mr. Keneally
  writes that it shocked him to hear of Ms. Yan's arrest and guilty plea and that Ms.
  Yan must "bitterly regret" her actions, particularly given the impact on her
  daughter, Victoria, whose "education and well-being" are foremost in Ms. Yan's
  mind.  Ex. 1 (Letter of Thomas Keneally).

- John McDonnell, the editor of Inside Canberra, a newsletter, and former trade
  advisor to two Australian Prime Ministers, including during postings in China,
  describes that he socialized with Ms. Yan and her husband, observed Ms. Yan at
  work in China, and accompanied Ms. Yan to meetings in various Chinese
  provinces.  Mr. McDonnell states that "Ms. Yan always maintained the highest
  standards of probity" and "worked diligently on helping to overcome cultural
  differences between Chinese and foreigners."  Ex. 1 (Letter of John McDonnell).

- Peter Norton, who describes himself as "the person behind the Norton Anti-Virus programs which protect personal computers," states that he has known Ms. Yan "for well over a dozen years, both as a business associate [through eChina Cash, where Mr. Norton served on the Board] and as a personal friend." He describes that he has known Ms. Yan to be "a person of integrity who acts honorably and correctly" and a "smart, capable and healthy person" who "is capable of rehabilitat[ing] herself," if given the chance. Ex. 1 (Letter of Peter Norton).

- James Kelly, a retired U.S. diplomat and former Assistant Secretary of State for East Asian and Pacific Affairs from 2001 to 2005, met Ms. Yan through Mr. Uren in the early 1990s, in Canberra. Mr. Kelly's contacts with Ms. Yan and her husband over the years have been social in nature, and he has spoken with Ms. Yan since her arrest. From these conversations, which were not about the crime, Mr. Kelly has gleaned that Ms. Yan is "deeply remorseful," understands that "her reputation must be rehabilitated," and is "determined to do that." Mr. Kelly states his belief that "these acts [*i.e.*, the charged acts] are not consistent with the person I have known." Ex. 1 (Letter of James A. Kelly).

- Douglas Paal is currently the Director of the Asia Program and Vice President for Studies of the Carnegie Endowment for International Peace, and served formerly as Vice-Chairman of JPMorgan Chase International, and a member of the National Security Council staffs of Presidents Ronald Reagan and George H.W. Bush. Mr. Paal has known Ms. Yan since she lived in Washington, D.C., and maintained a social relationship with Ms. Yan and Mr. Uren over the years that Ms. Yan developed her consulting businesses. Mr. Paal has written that Ms. Yan's crime has been "a shock and puzzlement to me, seeming so out of character for the person I have known." He has particular concern that Ms. Yan's punishment "inflict[] the least burden possible on Victoria," whom he describes as a "lovely and capable young woman," who will need her mother's support in recovering from her heartbreak. Ex. 1 (Letter of Douglas H. Paal).

- Gregory Rudd, the brother of the former Prime Minister of Australia, met Ms. Yan when he lived in China with his son, around 2008. He writes that while he never did business with Ms. Yan, he and she would "talk often about the world and the different way business is done in the world." He states, "Sheri Yan is a person you can trust" and notes that because his relationship with Ms. Yan was well known, journalists have asked him since Ms. Yan's arrest, "do you still believe that she can be trusted?" Mr. Rudd states that his answer has been "yes." While admitting that he knows "nothing" of the allegations against Ms. Yan, Mr. Rudd concludes, "The only thing I can say is the Sheri Yan I met and knew was a good person." Ex. 1 (Letter of Gregory P. Rudd).

- Ayman Faheem, the concierge of the building in which Ms. Yan currently resides, has known Ms. Yan for approximately two years and sees her almost every day. He has written that Ms. Yan is "very kind" and "loving and caring in every aspect to every one." Mr. Faheem has seen Ms. Yan's pain reflected in her tears and is sure

12

that, given a second chance, Ms. Yan "will be a great, wonderful person to our society as she has always been." Ex. 1 (Letter of Ayman Faheem).

• Zorica McCarthy, a retired Australian Foreign Services Officer and former Australian Ambassador, describes Ms. Yan's "gentleness, innate goodness, and generosity of spirit" and how she "brings light and joy into the world for her family and many friends." She recalls Ms. Yan's wedding reception at which, "in full bridal gown, [Ms. Yan] knelt down and fed a serving of cake to her friend and former employer [Ms. O'Bear], who was confined to a wheelchair." Over the course of 20 years, Ms. McCarthy has concluded that Ms. Yan is a "quintessentially good person of great personal integrity," who is now "extremely remorseful." Ex. 1 (Letter of Zorica McCarthy).

• Thomas Uren is Ms. Yan's stepson and has known her for over 20 years. He and his wife, Rachel Uren, describe Ms. Yan as a "kind, generous" person with a "big heart," who "dotes" on their children. They recount how Ms. Yan has always "demonstrated enormous care for [their] family," including by "go[ing] out of her way to prepare meals and care packages" for them during difficult times. The "warmth and love" that Ms. Yan shows Thomas Uren and his family is "deeply felt." They know that "when she is able, [Ms. Yan] would like to spend more time with her family" and they are "very much looking forward to that." Ex. 1 (Letter of Thomas and Rachel Uren).

• Zoe Morrison is the best friend of Ms. Yan's daughter, Victoria. Ms. Morrison describes Ms. Yan as a "mother figure," a "friend," and a "role model" from whom she learned "the strength of love." Ms. Morrison recalls how Ms. Yan supported her when her sister was diagnosed with leukemia, forcing her sister and mother to leave Beijing "virtually overnight." During this moment of crisis, Ms. Yan "opened her house" to Ms. Morrison and helped to "keep [her] life feeling normal." She describes being "instantly enveloped in [Ms. Yan's] warmth, her generosity, the way in which she perceives me as one of hers simply because she loves Victoria and Victoria loves me." Ms. Morrison also notes Ms. Yan's "heartbreaking remorse" and how Ms. Yan's heart hurts "not for herself but for everyone around her who was affected." Ex. 1 (Letter of Isobel (Zoe) Morrison).

### 3.    The Effects of the Prosecution on Ms. Yan

Of course, Ms. Yan's life has been up-ended and destroyed by her arrest and conviction.

At a more detailed level, this has meant many things.

First, Ms. Yan's regard of herself as a person who valued goodness and honesty—and

lived goodness and honesty—has been cruelly stripped away. Mr. Uren describes his wife as

having been "inwardly crushed" by having shamed not just herself, but the tight circle of her

family.  Ex. 1 (Letter of Roger T. Uren).  At the age of 20, Ms. Yan's daughter Victoria has

assumed, in very difficult, traumatic circumstances, the adult role of leading her family.  She was

compelled to withdraw from Wellesley College last fall after her absences piled up while her

mother was detained.  Later, she cancelled the spring semester she had planned to spend at

Cambridge University.  It is excruciating for Ms. Yan to contemplate the affects that being

associated with Ms. Yan have had and will have on Victoria's future.  She has burdened her

daughter with stepping up to care for her parents and grandparents.  The crashing down of Ms.

Yan's self-perception that she had succeeded in creating a strong role model for her daughter has

fundamentally rearranged the mother-daughter relationship and caused Ms. Yan great pain.

Moreover, it is impossible in the internet age, in a high-profile case, to overstate the

change in circumstances for Ms. Yan caused by the public and permanent shaming.  It has

multiplied the distress to Ms. Yan and her family that the world knows her, and posterity may

always first regard her, as a criminal rather than for all the good she has done for others.  Ms.

Yan and Mr. Uren had always taken precautions, given Mr. Uren's background as a known

figure in public service in Australia, to give a wide berth to any potential controversy, in business

dealings or any other sphere.  Now Ms. Yan is facing the circumstance that by her conduct, she

has, as she puts it, tarnished her spouse's "correctness in his entire life."  Ex. 1 (Letter of Sheri

Yan).  In the first days after her arrest, while being detained at the MCC and then MDC, Ms. Yan

was distraught over how to tell her parents of her arrest.  In the end, she was deprived of the

opportunity to do so, because friends of her parents in China called media articles published in

China to Ms. Yan's parents' attention before Ms. Yan could find her own way to tell them.

As the Court may have discerned at the plea hearing, Ms. Yan's emotional state since her

arrest has declined to a state of precariousness.  This has been as a result of her shame, her

anxiety that she has failed her parents and may never see them again, and the shock of losing her own image of herself.  Ms. Yan's daughter, Victoria, describes that Ms. Yan's "confidence has been pulverized," and that Ms. Yan has episodes of uncontrolled crying every day.  Ex. 1 (Letter of Victoria Uren).  At times, according to Victoria, she cannot help but think of a beaten dog when she sees the emptiness and dejection in her mother's eyes.  *See id*.  The Pre-Trial Services Officer who was supervising Ms. Yan's home detention became sufficiently concerned about Ms. Yan that he referred her to a certified social worker for counseling, who in turn referred Ms. Yan to a psychiatrist.  *See* PSR ¶¶ 98-100.  Both the social worker and the psychiatrist have diagnosed Ms. Yan to be suffering from Major Depressive Disorder, brought on by her case, and a mixed anxious and depressive mood.  *See id.* ¶¶ 99-100.  Ms. Yan continues to meet with the social worker twice a week, and the psychiatrist once every two weeks, and finds the care to be extremely helpful.

In one voice, Ms. Yan's friends and family have pointed out that incarceration cannot teach Ms. Yan or imbue upon her the characteristic of goodness, because goodness and good intentions have always been one of her strongest characteristics.  The honorable way in which Ms. Yan led her life until she met John Ashe, the considerable life hardships that she overcame, and the suffering that Ms. Yan has experienced more recently from learning the hard lessons of the dangers of ego, vanity, and foolishness should all be viewed to mitigate the need for punishment.[4]

### B.     The Nature and Circumstances of the Offense

Ms. Yan has admitted to passing bribes to Mr. Ashe, starting in the spring of 2012.  She allocuted to the Court as follows, in relevant part:

---

[4]  Gathered into one Exhibit to this Memorandum are photographs of Ms. Yan and her family from Ms. Yan's childhood to the present.  *See* Ex. 2.

> Starting from around the springtime of 2012, me and other people, we agreed to and did pay money to John Ashe.  At the time he was the permanent representative to [the] United Nations from Antigua, as well as the president of the U.N. General Assembly.  These payments were made so that John Ashe would persuade officials in Antigua to enter into business contracts with foreign companies.  These payments were also made so that John could use his position as the president of the General Assembly. . . . [a]nd the contacts he was able to make because of his position in order to help me and others to promote business ventures from which we intended to profit . . . .

Plea Hr'g Tr. 19:15-23; 20:2-4, Jan. 20, 2016.

The Complaint, which has been quoted at length in the Presentence Report, *see* PSR ¶¶ 22-32, 34-53, described the larger circumstances in which Ms. Yan made payments to Mr. Ashe. The Complaint described two separate wings of a bribery scheme, in which Mr. Ashe was the hub and linchpin.  In its "Overview," the Complaint alleged that the case "involves businesspeople paying bribes to defendant John W. Ashe, at the time when he served as the United Nations Ambassador for Antigua and Barbuda and as the 68th President of the United Nations General Assembly."  Compl. ¶ 10.  It also stated that beginning in the spring of 2011, Mr. Ashe accepted more than a half million dollars in bribes facilitated by Francis Lorenzo, who was at the time the Deputy Permanent Representative to the United Nations for the Dominican Republic, Ng Lap Seng, a Chinese national and head of a major real estate development company based in Macau, and Jeff C. Yin, the principal assistant to Ng Lap Seng.  *See* Compl. ¶¶ 10, 16-18, 21.  In that wing of the bribery conspiracy, it is alleged that Mr. Lorenzo and Mr. Yin arranged to funnel Mr. Ng's money to Mr. Ashe as a *quid pro quo* for Mr. Ashe using his influence at the United Nations to promote a Macau Conference Center for the United Nations, developed by Mr. Ng.  *See* Compl. ¶¶ 10, 30-43.

16

Among the methods that Mr. Ashe used to receive the illicit payments was to set up bank accounts bearing the name "PGA"[5] or "President of the General Assembly," but controlled by himself and used by himself to fund his personal expenses rather than any business of the Office of the PGA.  *See* Compl. ¶ 12.  According to the government, Mr. Ashe solicited, and obtained, funds from Mr. Ng, Mr. Lorenzo, and Mr. Yin, by demanding that the others pay items such as a family vacation to New Orleans and a $30,000 basketball court for Mr. Ashe's house in Westchester County.  *See* Compl. ¶¶ 22, 25.  Mr. Ashe's bribe-fueled efforts on behalf of Mr. Ng are alleged to have included ensuring that U.N. documents were altered, by U.N. personnel, to tout the Macau Conference Center.  *See* Compl. ¶¶ 40 & 40a-d.

Ms. Yan and Ms. Piao are alleged to have been participants in the second wing of the conspiracy—arrangers of a second stream of bribe payments solicited by, and bound for, Mr. Ashe, and originated by Chinese businessmen who sought to obtain government contracts in Antigua and elsewhere.  *See* Compl. ¶ 44.  The Complaint described three sets of bribes, as follows.

*First*, the government alleged that within weeks of Mr. Ashe's first meeting with Ms. Yan and Ms. Piao in Hong Kong, in April 2012, Mr. Ashe had sought, and Ms. Yan and Ms. Piao had arranged, to make a $300,000 payment from "CC-1," a "Chinese media executive," to one of the PGA accounts that Mr. Ashe had set up.  *See* Compl. ¶¶ 45 & 45a-d.  He characterized the $300,000 payment that Ms. Yan and Ms. Piao had arranged as "PGA funding" and "contributions," but also "a show of good faith" by CC-1 that would enable Mr. Ashe to "start

---

[5]  "PGA" refers to President of the General Assembly.

the conversation" with Antiguan officials, including the Antiguan Prime Minister, regarding "the business aspects of [CC-1's] initiatives for Antigua and Barbuda."  Compl. ¶¶ 45b, 45e-g.[6]

Ms. Piao and Ms. Yan acknowledged the emails of Mr. Ashe that described his endeavors in Antigua, thanking him and stating that they had relayed his "good news" back to CC-1. Compl. ¶ 45h.  Without alleging that Ms. Yan or Ms. Piao were aware of the specific amounts, the Complaint alleged that Mr. Ashe disbursed $100,000 of the $300,000 to the then-Prime Minister of Antigua and $13,000 to the Prime Minister's political party.  *See* Compl. ¶¶ 46a-b. The Complaint also stated that Mr. Ashe used part of the $300,000 to lease a BMW and to satisfy personal credit card debt.[7]  *See* Compl. ¶¶ 46c-d.

*Second*, the Complaint alleged that after Mr. Ashe was elected President of the General Assembly, in June 2013, Ms. Yan and Ms. Piao began sending $20,000 monthly to an account Mr. Ashe identified as his personal bank account.  *See* Compl. ¶¶ 47 & 47a-c.  In addition, the Complaint stated that after Mr. Ashe assumed the Presidency, in the fall of 2013, Ms. Yan and Ms. Piao arranged for "CC-2," purportedly a "Chinese security technology executive," to send

---

[6]  *See also* Email from Mr. Ashe to Ms. Yan and Ms. Piao (July 26, 2012).

[7] The Probation Office's final Presentence Report contains a lengthy discussion of what the government and the Probation Office apparently deemed to be Ms. Yan's false denial, in her objections to the draft Presentence Report, that she knew that "Ashe was using bribery funds to pay for personal and luxury items."  PSR at 32-33.  Ms. Yan has never denied knowing that Mr. Ashe used funds she paid him for personal and luxury items.  As described *infra* at 23-24, for example, she herself offered to pay a Chinese tailor for overcoats that Mr. Ashe purchased for himself.

Ms. Yan's objection was specifically to paragraphs 12, 13, and 32 of the draft Presentence Report, based on the fact that she was never shown to have known, nor did she know, that Mr. Ashe disbursed funds *from the accounts denominated as PGA accounts* to fund the purchase of personal or luxury items.  *See* PSR ¶¶ 12, 13, 32; *see also* Letter from Christine H. Chung to Johnny Kim, U.S. Probation Officer (Apr. 7, 2016).  In particular, Ms. Yan had no knowledge that Mr. Ashe was using bribes purportedly paid by Mr. Ng, and which Mr. Ashe had routed through the PGA accounts, to pay the mortgage on his Dobbs Ferry home or for Rolex watches, *see* PSR ¶ 13, or those paid by herself and which Mr. Ashe had routed through the PGA accounts, to make his monthly auto lease payments and pay his credit card debt, *see* PSR ¶ 32.

approximately $100,000 to one of the PGA accounts set up by Mr. Ashe to pay for a reception

for Mr. Ashe.  *See* Compl. ¶ 48.  The Complaint implied that in December 2013, Ms. Yan and

Ms. Piao arranged a second payment of $100,000, to one of the "PGA" accounts set up by Mr.

Ashe, on behalf of the Chinese Security Company.  *See* Compl. ¶¶ 48j-l.  After receiving that

payment, according to the Complaint, Mr. Ashe arranged meetings between executives of the

Chinese Security Company and officials in Antigua which resulted in a "signed MOU

[Memorandum of Understanding]."  *See* Compl. ¶¶ 48l-n.

     *Third*, the Complaint alleged that, in October 2013, Ms. Yan and Ms. Piao arranged a

$200,000 payment to one of the PGA accounts opened by Mr. Ashe "in exchange for Ashe

making an official appearance at a conference in China being organized by a Chinese real estate

developer," identified as "CC-3."  Compl. ¶ 49.  The Complaint described that also in the fall of

2013, Mr. Ashe purportedly appointed Ms. Yan and Ms. Piao as "Advisers" in "Economic

Matters" to the Office of the President of the General Assembly and as "Advisers" to the Office

of the Prime Minister of Antigua and Barbuda in matters pertaining to investments in Antigua.

*See* Compl. ¶ 49e.

     The terms of her plea agreement allowed Ms. Yan to plead to a single count of

substantive bribery, in violation of 18 U.S.C. § 666(a)(2).  As described above, she allocuted,

without addressing specific payments, that she and others made payments to Mr. Ashe before

and during his term as President of the General Assembly for the purpose of persuading officials

in Antigua to enter into business contracts with foreign companies.  Ms. Yan agreed per her plea

agreement that the value of the bribery payments for which she should be held accountable at

sentencing was at least $550,000.  *See* PSR ¶ 68 (citing U.S.S.G. § 2B1.1(b)(1)(H)) (specifying

14-level enhancement where bribery payments are more than $550,000 but not more than $1.5

million).  She also agreed with the government that a forfeiture judgment should be entered in the amount of $300,000.  *See id.* ¶ 154.

In pleading guilty, at the risk of subjecting herself to a substantial term of incarceration, Ms. Yan has fully acknowledged the seriousness of her conduct.  While she does not agree to every fact or suggestion contained in the Complaint,[8] she has not quibbled about accepting responsibility for a value of hundreds of thousands of dollars of bribe money she helped to funnel to Mr. Ashe.  The letter Ms. Yan has submitted to the Court, and those submitted on her behalf, also make clear that Ms. Yan deeply appreciates the gravity of the conduct in which she engaged.

---

[8] For example, while it does not affect her plea or the sentencing calculation, because Ms. Yan has agreed in any event to helping to pay over $550,000 but not more than $1.5 million in bribes, Ms. Yan has never agreed that the $200,000 in payments made by CC-3, as described in the Complaint, constitute bribery.  The Complaint alleged that CC-3 was asked to cover the expenses incurred by Mr. Ashe and his retinue in traveling to the Guangzhou conference so that Mr. Ashe could make a speech, and identifies the *quid pro quo* as the pleasantries of CC-3 and/or Ms. Yan in offering Mr. Ashe a "permanent convention venue" for U.N. meetings and hopes of a good "future relationship."  Compl. ¶¶ 49 & 49a-g.

Just two weeks ago, however, the Supreme Court unanimously ruled, in *McDonnell v. United States*, No. 15–474, 597 U.S. ___, 2016 WL 3461561 (June 27, 2016), that the term "official act" in 18 U.S.C. § 201 (Bribery of Public Officials) cannot be read to encompass "merely arranging a meeting or hosting an event" without rendering the statute susceptible of unconstitutional vagueness.  *Id.* at *20.  *McDonnell* lays bare the defect in the allegations regarding CC-3.  Mr. Ashe did not even arrange the Guangzhou event; he attended it, on an expenses-paid basis, as he was free to do under United Nations rules.  *See* discussion *infra* at 26-29.  More importantly, the government has never identified any "focused and concrete" matter pending before the United Nations that CC-3 was attempting to have decided in his favor, as a *quid pro quo* for CC-3's reimbursement of Mr. Ashe's travel expenses.  *Id.* at *14.  Under *McDonnell*, to propose a matter "at a much higher level of generality," such as, in that case, "Virginia business and economic development," is insufficient.  *Id.*  The Complaint here, as did the government in *McDonnell*, has pointed to only airy aspirations of future business development.

Having accepted responsibility for her offense, Ms. Yan respectfully requests that the Court include in its consideration of the "nature and circumstances" of that offense the following additional facts and factors.

*First*, Ms. Yan is not alleged to have participated, or known about, a significant portion of the conduct alleged in the Complaint—namely, the bribes purportedly originated by Ng Lap Seng.  At a minimum, and as described further below, Ms. Yan is far less culpable than Mr. Ashe, the leader of the two bribery schemes who lined his pockets with the proceeds of each.

*Second*, Ms. Yan's role in the wing of the conspiracy in which she participated was not that of the leader or even primary participant.  She served as the arranger and go-between.  The bribe money originated from the Chinese companies that stood to gain business if the bribes were successful, and it ended up in the hands of Mr. Ashe and his colleagues in Antigua and Barbuda.  Ms. Yan gained none of those funds; her intention was instead to make income from having served as the go-between in whatever business venture succeeded.  And as none did, she gained nothing.

*Third*, and importantly, Ms. Yan's crime was one of stupidity rather than venality.  The numerous letters submitted by friends and family attest that, as a matter of character, Ms. Yan could not have been intending to harm anyone by her actions.  The emails which the government deploys so devastatingly in other respects do not say otherwise.  In the words of business executive Bruce Dover, who is currently Managing Director of DCI Media Group and who had hired Ms. Yan as a consultant with respect to Chinese business, the mistake that Ms. Yan made was to fail to appreciate fully that the consequences of paying or gifting a senior official would be different in the United States than in China.  *See* Ex. 1 (Letter of Bruce Dover).  According to Mr. Dover, Ms. Yan failed to heed warnings given by himself, at a minimum, that the "grey

zone" for such conduct in China did not exist in the "black or white" world of the United States. *See id.* Ms. Yan's cousin-in-law, too, assesses that Ms. Yan "acted foolishly and failed to pay proper heed to the laws governing the relationship between officials and business investors." Ex. 1 (Letter of David Uren).

By her own admissions, Ms. Yan engaged in bribing Mr. Ashe for selfish, prideful, and unhealthy reasons. She was flattered by Mr. Ashe's attentions and impressed by his title. She aspired to be admired, by Mr. Ashe and others, as a "successful, independent businesswoman" who could move in high-flown circles. Ex. 1 (Letter of Sheri Yan).

Ms. Yan's vanity and ambition, and perhaps her desire to find a reason to move to the United States as her daughter prepared to attend a U.S. college,[9] also caused her to disregard her incomplete understanding of the working of the United Nations or U.S. rules of business governance. Ms. Yan also failed to pay sufficient heed to the danger posed by her imperfect facility in reading and writing English.[10] Also, while her charitable instincts toward the United Nations and goals such as global sustainability were sincere, she debased them by using her newly gained U.N. connections, and the foundations she helped to establish, as vehicles for payments to promote business ventures.

---

[9] *See* Ex. 1 (Letter of Victoria Uren) ("My plans [to attend school in Boston] made my mom come up with a way to be close to me so that we could see each other more than just twice a year. . . . [M]y mom would never have had any proximity to the UN had it not been for the fact that Boston and New York are a few hours apart by bus.")

[10] For a video of Ms. Yan engaging in public speaking in English, see Black Tie Magazine, *Sheri Yan at the United Nations Headquarters*, YouTube, https://www.youtube.com/watch?v=7TWCJfKsWEc&app=desktop (Ms. Yan speaking at a Women Leaders Forum event at the U.N. on September 22, 2014) (last visited July 10, 2016). Ms. Yan referred to her practice of getting help to compose written English in her emails to Mr. Ashe. In an email dated February 13, 2013, Ms. Yan stated to Mr. Ashe: "Normally when we write to you, Heidi [Ms. Piao] and I always sit together to draft the email, and she will represent both of us in writing since her writing is quicker and better . . . ." Email from Ms. Yan to Mr. Ashe, copying Ms. Piao (Feb. 13, 2013).

Ms. Yan's aspirations propelled her headlong; it can seem inapt to call one who so avidly responded to Mr. Ashe's demands naïve.  In one respect, though, Ms. Yan's gullibility served her badly.  As shown by the emails excerpted in the Complaint—or really any sampling of Mr. Ashe's emails—Mr. Ashe was an affirmatively predatory individual who planned well ahead of assuming his office to trade on it, to the fullest possible extent.  He held his hand out constantly.  Ms. Yan's husband has explained that his wife's "judgment about how she conducted herself with people she viewed as 'celebrities' was not always sound."  Ex. 1 (Letter of Roger T. Uren).

Ms. Yan has admitted that she was a willing partner, but in terms of relative culpability, she was also a ready target or "mark" for Mr. Ashe.  Ms. Yan and Ms. Piao gave Mr. Ashe the Chinese nickname of the "Giant," and they treated him as one.  He constantly sought funds: saying, for example, that Ms. Yan's and Ms. Piao's "initial contribution" would be "used" such that "any additional contribution(s) to the account . . . would be most welcomed," Compl. ¶ 45f, or hinting that the "initial resources" he had in hand "have now been fully utilized," Compl. ¶ 45h, or closing a paragraph about an upcoming concert at the United Nations that, "Needless to say, this endeavour will require major resources."[11]

The women most often responded by scrambling to find other donors in China, for whom Mr. Ashe, Ms. Yan, and Ms. Piao also arranged business opportunities.  In their emails to Mr. Ashe, Ms. Yan and Ms. Piao abased themselves by repeating how glad they were of Mr. Ashe's "friendship" and even apologized for their failures to meet their "contribution" goals.[12]  In one

---

[11]  Email from Mr. Ashe to Ms. Yan and Ms. Piao (Jan. 18, 2014).  "Urgent replenishment" was a favored catchphrase of Mr. Ashe.  *See* Email from Mr. Ashe to Ms. Piao and Ms. Yan (Sept. 5, 2012) ("I refer of course to the urgent replenishment of the NY account."); Email from Mr. Ashe to Ms. Piao, copying Ms. Yan (Aug. 16, 2012) (subject: "Urgent replenishment").

[12]  *See* Email from Ms. Yan to Mr. Ashe (June 4, 2014) ("[W]e really wish we could do more.").

telling email chain, Ms. Yan and Ms. Piao apologized repeatedly to a Hong Kong tailor for their delay in paying for about $16,000 in overcoats that Mr. Ashe had had made.[13]  Mr. Ashe intervened, directing Ms. Yan and Ms. Piao to "please touch base with him before he thinks we are trying to gyp him out of his fees."[14]

Ms. Yan only dared once to suggest to Mr. Ashe that it was "very sad" that it seemed their "friendship mostly depending on money [sic] and your trust to us [sic] is also depending on money."[15]  Mr. Ashe's reaction was to put her down.  He responded that he did not care for her "pass[ing] judgement" on him, and remarked that the promises made by Ms. Yan and Ms. Piao "generally amount to nothing," such that "experience has thought [sic] me not to take any of your promises at face value."[16]  He melodramatically pretended to blame himself as part of inflicting guilt.  ("[T]his is now my headache and I will figure something out").[17]

Mr. Ashe also exerted pressure—and maximized his gains—by playing his "donation" sources against each other, threatening Ms. Yan and Ms. Piao that he could take his attentions to others.  For example, on one occasion when Ms. Yan and Ms. Piao apologized that they were unable to respond to Mr. Ashe's request for "an injection of funds as soon as possible,"[18] Mr.

---

[13]   *See* Email chain between Ms. Piao and Mr. Ashe's tailor (Nov. 27, 2013 to Jan. 1, 2014).

[14]   Email from Mr. Ashe to Ms. Piao, copying Ms. Yan (Jan. 4, 2014); *see also* Email from Mr. Ashe to Ms. Yan, copying Ms. Piao (Oct. 4, 2013) (requesting that Ms. Yan and Ms. Piao "work something out with the manager of the Millennium [Hotel]" so that he could maintain a suite there for the entire term of his presidency).

[15]   Email from Ms. Yan to Mr. Ashe (June 3, 2014).

[16]   Email from Mr. Ashe to Ms. Yan, copying Ms. Piao (June 4, 2014); *see also* Email from Mr. Ashe to Ms. Yan and Ms. Piao (Sept. 30, 2014) (characterizing past efforts of Ms. Yan and Ms. Piao as a "gab fest and empty promises").

[17]   Email from Mr. Ashe to Ms. Yan, copying Ms. Piao (June 4, 2014).

[18]   Email from Mr. Ashe to Ms. Yan and Ms. Piao (Feb. 2, 2013); Email from Ms. Piao to Mr. Ashe and Ms. Yan (Feb. 8, 2013) (responding to Mr. Ashe's request).

Ashe responded that waiting was not possible and that he would "need to explore other funding windows/avenues so that I can address the current needs."[19]  Another time, Mr. Ashe stated that, instead of relying on Ms. Yan and Ms. Piao, he would turn to "Vivian [Wang] and Forrest," whom he characterized as having "always remained consistent in their friendship and consistently delivered on whatever small promises their [sic] made."[20]

To use her husband's word, Ms. Yan's "judgment" in ever agreeing to deal with Mr. Ashe was tragically bad.  Ex. 1 (Letter of Roger T. Uren).  In none of the sad and ugly dealings, however, is it revealed that Ms. Yan intended to hurt any person or institution by acceding to Mr. Ashe's demands for funds and arranging the meetings that either Mr. Ashe offered or her sources requested.  It is questionable, to say the least, whether Mr. Ashe or his friends in government in Antigua and Barbuda ever truly intended to advance any business venture that Ms. Yan or her contacts in China sought.  In any event, there is no evidence that Ms. Yan doubted the utility of those ventures.

The final mitigating circumstance is that the bribery in which Ms. Yan engaged did not, in the end, injure the public.  None of the bribes to Mr. Ashe succeeded in their goal; none of the Antiguan business ventures came to fruition.  The Complaint, for all its detail, does not say differently.  It barely identifies CC-1's business "initiative" and does not claim that it ever bore fruit in the form of business in Antigua.  The Complaint does not allege that CC-3 gained any business advantage, or even sought one, after paying for Mr. Ashe and his retinue to attend the

---

[19]  Email from Mr. Ashe to Ms. Piao and Ms. Yan (Feb. 10, 2013).

[20]  Email from Mr. Ashe to Ms. Yan, copying Ms. Piao (June 18, 2013).

Guangzhou conference.  Nor did CC-2's apparent idea to build a "national internet security system" in Antigua and Barbuda ever result in such a system, according to the Complaint.[21]

Indeed, although the case has been glamorized because of the involvement of the United Nations and former diplomats to the United Nations, the crimes of Ms. Yan are strangely victimless.  Instead the parties who are affected share blame and responsibility.  The Antiguan government, members of which pocketed the bribe money, has denied its own misconduct.  Specifically, that government responded in March 2016 to the U.S. Department of State's request that it waive Mr. Ashe's diplomatic immunity for the conduct alleged in the Complaint.[22]  It refused to do so and additionally characterized as "official acts" of Mr. Ashe his conduct in advocating for the interests of CC-1 and CC-2, accepting an invitation to attend the Guangzhou conference from CC-3, and advocating for the business interests of the Foundations established by Ms. Yan.[23]  The government of Antigua and Barbuda has taken the view that the actions of Mr. Ashe were "in the interest and for the good of Antigua and Barbuda."[24]

Much as its mission is lofty, the United Nations also created conditions that made it possible for Mr. Ashe to seek and obtain funds to enrich himself, from Ms. Yan and others, while

---

[21]  The Complaint touted an MOU [Memorandum of Understanding] that was signed by the Chinese Security Company soon after Mr. Ashe received $100,000.  *See* Compl. ¶¶ 48k-n.  But there is no evidence that the MOU signed with a representative of that company ever moved forward.  Chinese language emails not referenced in the Complaint also appear to establish that the $100,000 payment that allegedly helped the Chinese Security Company secure the MOU was not paid by that Company or CC-2, but instead by a different Chinese company not otherwise named in the Complaint and engaged in the real estate business.  *See, e.g.*, Email from CC-2 to Ms. Yan, copying Ms. Piao (Dec. 2, 2013) (Chinese email and English translation).

[22]  *See* Ex. 3 (Request from U.S. Dep't of State to Embassy of Antigua and Barbuda, dated Jan. 6, 2016; Response from Embassy of Antigua and Barbuda to U.S. Dep't of State, dated Mar. 18, 2016).

[23]  *See id.*

[24]  *Id.*

escaping detection.  After the arrests of Ms. Yan and her co-defendants were splashed in the

media, that institution conducted "audits," convened "Task Forces" and issued "ratings" and

"recommendations."[25]  Cutting through the bureaucrat-ese, it is plain that U.N. failings set the

stage for Mr. Ashe's exploitation.  The Task Force of U.N. Secretary-General Ban Ki-moon

concluded, in a report issued in March 2016, that Mr. Ashe's crime "occurred in an environment

where there were significant loopholes and blind spots in the operational arrangements for the

President [of the General Assembly] and the Office [of that President]."[26]  Among these were

that the PGA is permitted to receive "voluntary contributions from Member States,

intergovernmental organizations, national institutions, non-governmental organizations,

individuals and others."[27]  Indeed, as a practical matter, PGAs were compelled to seek voluntary

contributions, because the Office of the PGA in recent history has not come near to receiving

funding from the U.N. sufficient to support its operations.[28]

 In addition, although a "Trust Fund" exists to receive "voluntary contributions"[29] to the

PGA, and that Trust Fund falls within the oversight of the United Nations, nothing prevented Mr.

Ashe (or any other President) from opening other accounts and receiving voluntary contributions

---

 [25]  *See* U.N. Secretary-General's Task Force, *Rep. on the Functioning of the Office of the President of the General Assembly*, U.N. Doc. A/70/783 (Mar. 23, 2016), http://www.un.org/pga/ 70/wp-content/uploads/sites/10/2015/08/29-Mar_AHWG-Revitalization-29-March-2016.pdf (hereinafter, "Task Force Rep."); U.N. Office of Internal Oversight Servs., *Audit of the U.N. Secretariat's Engagement with Selected Non-Governmental Organizations and a Related Entity*, Rep. 2016/021 (Mar. 22, 2016), https://oios.un.org/ page/download /id/473; U.N. Office of Internal Oversight Servs., *Audit of the Management of the Trust Fund in Support of the Office of the President of the General Assembly*, Rep. 2016/022 (Mar. 22, 2016), https://oios.un.org/page/ download/id/474 (hereinafter, "OPGA Audit Rep.").

 [26]  Task Force Rep. ¶ 4.

 [27]  *Id.* ¶¶ 31, 34.

 [28]  *See id.* ¶ 41.

 [29]  *See id.* ¶ 31.

into those accounts, which were not subject to any U.N. controls.[30]  The Secretary-General's Task Force noted that the historical instances of "supplementary funding" received by Presidents of the General Assembly were themselves unknowable because "no records are available" and the contributions had been "received and expended at the sole discretion of Presidents."[31]  As the Task Force report put it, in addressing what it called "bilateral transactions" that resulted in "supplementary funding":  "there were no requirements for Presidents to report on their receipt and use to the General Assembly."[32]  It described voluntary contributions as "not visible" to the General Assembly.[33]

The United Nations also found that because of the lack of accountability, Mr. Ashe received millions from Member States into non-Trust Fund accounts while he served as PGA, in addition to the hundreds of thousands in funds he received from non-governmental organizations and individuals.[34]  Now, long after the cow has left the barn, various arms of the United Nations have recommended or undertaken to take such measures as developing "common principles of conduct for the President and all personnel of the Office" and creating "financial disclosure requirements for the President."[35]  The Secretary-General has recommended that the General Assembly consider requiring its Presidents to "systematically provide information to the

---

[30]  *See id.* ¶¶ 34-35; OPGA Audit Rep. ¶¶ 21, 25.

[31]  Task Force Rep. ¶ 34.

[32]  *Id.* ¶¶ 34-35.

[33]  *Id.* ¶ 35.

[34]  OPGA Audit Rep. ¶¶ 17-18, 21, 25.

[35]  Task Force Rep. ¶ 8.  The Task Force has found, "perhaps most significantly," that "there are no formal, agreed common principles of ethical conduct or financial disclosure measures for the President and the personnel of the Office, except those serving under United Nations letters of appointment."  *Id.* ¶ 7.

Assembly in an end-of-presidency report."[36]  Notably, the Task Force has not deemed it warranted to recommend banning voluntary contributions outside of the Trust Fund.  Instead it has recommended that the "details of the contributions channeled outside the Trust Fund . . . be disclosed to the General Assembly in an appropriate manner."[37]

While Ms. Yan's case has been high-profile and Ms. Yan's aspirations were large, a consideration of all of the "nature and circumstances" of Ms. Yan's crime demonstrates significant mitigating factors.  The dollars that changed hands were significant, to be sure.  But Ms. Yan was the middleman who gained nothing, was far less sophisticated or venal than Mr. Ashe, and her ill-conceived and ham-handed efforts ended up hurting no one so much as herself.

### C.      The Sentencing Guideline Range

Section 3553(a) requires the sentencing judge to consider, among the other factors listed therein, the "kinds of sentence and the sentence range" established for the crime as set forth in the Sentencing Guidelines.  18 U.S.C. § 3553(a)(4).  Here, Ms. Yan and the government have agreed on the adjusted offense level that applies to the sole Count of conviction, under U.S.S.G. § 2C1.1 (Bribery):

| | |
|---|---|
| Base Offense Level: | 12 (instead of 14, because Ms. Yan is not a public official) |
| Value of Bribes: | +14 (because the value exceeded $550,000 but was not more than $1.5 million) |
| Involvement of Official in a High-Level Decisionmaking Position: | +4 |
| Adjusted Offense Level: | 30 |

---

[36]  *Id.* ¶ 25.

[37]  *Id.* ¶ 35.

In addition, because the parties agree that no other adjustments are called for, other than the three-level decrease for acceptance of responsibility, *see* U.S.S.G. § 3E1.1(a), the total offense level is 27. At a Criminal History Category of I, the resulting Guidelines range is 70 to 87 months. *See id.* Part A, Sentencing Table.[38]

This manner in which the Guidelines range is reached reinforces that the 70-87 month range significantly overstates the seriousness of Ms. Yan's conduct, even before consideration of the numerous other Section 3553(a) factors.

Ms. Yan's case is the paradigm of the Guidelines sentence—advisory though it may be—overstating the gravity of the offense because it takes into account primarily a single factor, in this case the value of the bribes paid. This is so for multiple reasons. First, the bribery guideline is completely insensitive to the fact that Ms. Yan did not keep any part of the bribes or profit from the scheme. Under the bribery guideline, a defendant who committed the same crime as Ms. Yan but kept or gained up to $1.5 million would be assigned the same Guidelines range as Ms. Yan. Second, the bribery guideline treats as equally culpable bribe givers, middlemen, and bribe takers. Third, the guideline does not allow calibration for the difference between bribes that cause injury or bear fruit versus those that do not. And finally, the guideline provides no way to adjust the range depending on who bears more responsibility for initiating or pursuing the bribes, such that Ms. Yan and Mr. Ashe would be treated the same, except for the two-level

---

[38] The Presentence Report reflects that in response to a government comment, made after the dissemination of the draft Presentence Report, the Probation Department included a section with the unusual name, "Conduct Not Part of Relevant Conduct." *See* PSR ¶ 78. In this paragraph, the Probation Office has described information relayed by the government that Ms. Yan had made a payment to the 69th President of the General Assembly, Sam Kutesa. *See id.* The Presentence Report fails to include the government's concession that it is "presently unaware of sufficient evidence" that the payment violated U.S. law. Letter from Daniel C. Richenthal, Assistant U.S. Att'y, to Johnny Y. Kim, U.S. Probation Officer (Apr. 13, 2016).

upward adjustment resulting from the fact that Mr. Ashe was a public official.  This assumes, of course, that the government had ever sought to punish Mr. Ashe for bribery at all.

The Honorable Jed S. Rakoff has written about the unfairness that results from the fact that the Guidelines for white collar and drug cases put an "overwhelming focus" on a single factor, simply because that factor is easier to measure than other, equally important factors.[39] The cost of treating quantity or loss as "the be all and end all" is that the Guidelines range that results, and then is taken into account at sentencing even in a post-*Booker* world,[40] will not "fairly convey the reality of the crime or the criminal."[41]

So, too, in Ms. Yan's case.  Every category of crime has a "heartland" of offenses and Ms. Yan's crime is not in that heartland.  Ms. Yan's case is perhaps unusual in the attention that she and her co-defendants have drawn, but hers is not the usual case in which the individual being sentenced either was the bribe-giver or bribe-taker, personally benefitted, and also corrupted a government system such that, for example, the public office wrongly denied benefits, or awarded contracts to undeserving applicants, or was induced to make payments or otherwise benefit the bribe-giver or someone designated by the bribe-giver.

The fact that the bribery guideline is overly dependent on the value assigned to the bribes, or the benefits obtained as a result of the bribes, is reflected in the circumstance that courts, including in this District, not uncommonly impose below-Guidelines sentences in cases of convictions under 18 U.S.C. § 666.[42]  For example, in August 2014, the Honorable George B.

---

[39]  Hon. Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should be Scrapped*, 26 Fed. Sent. R. 6, 7 (2013).

[40]  *See United States v. Booker*, 543 U.S. 220 (2005).

[41]  Rakoff, *supra* note 39, at 7.

[42]  This conclusion is drawn from reviewing publicly available information about sentencings in cases in the Southern and Eastern Districts of New York, and the Northern

Daniels imposed a sentence of a year and a day in a case in which the defendant, Novelette

Campbell, an employee of the Department of Housing and Urban Development, was convicted

after trial of accepting bribes of $35,500 in exchange for awarding Section 8 housing.  *See*

Sentencing Tr. at 2:15-3:21, 4:9-11, 10:16-17, *United States v. Campbell*, No. 12 Cr. 569 (GBD)

(S.D.N.Y. Aug. 12, 2014).  The Guidelines range was 41 to 51 months' imprisonment, and Judge

Daniels imposed a term far less than that, despite what he noted as the "serious nature of the

crime," the existence of "real victims," and the fact that the defendant "did everything she could

to avoid responsibility" for her actions.  *Id.* at 8:25-9:1, 9:16-17, 10:6-7.

In *United States v. Grushko*, No. 11 Cr. 33 (WHP) (S.D.N.Y.), the Honorable William H.

Pauley imposed a nine-month term of incarceration on a defendant who pleaded guilty to paying

dozens of bribes, ranging from hundreds to thousands of dollars, to New York City employees

from 2007 to 2010.  *See* Gov't Sentencing Mem. at 1, Apr. 25, 2011, ECF No. 71; Sentencing Tr.

at 12:2-3, May 10, 2011.  The bribes were paid to obtain licenses for day care centers, run by

Grushko or her co-conspirators, that had not been properly inspected or that planned to enroll

more children than permitted by the city safety regulations, or so that the day care centers

---

District of Illinois, in which violations of 18 U.S.C. § 666 were charged and such violations were
the primary basis of the Guidelines range and sentence imposed.

In addition, according to data maintained by the U.S. Sentencing Commission, in 2015,
almost 70% of defendants convicted of bribery offenses nationwide were sentenced below the
Guidelines range.  *See* U.S. Sentencing Comm'n, 2015 Sourcebook of Federal Sentencing
Statistics, Sentences Relative to the Guideline Range by Each Primary Offense Category (Tbl.
27A) (2015), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-
reports-and-sourcebooks/2015/Table27a.pdf.

Sentencing below the Guidelines range is particularly common in the Second Circuit,
moreover.  The U.S. Sentencing Commission's data shows that, last year, across all offenses,
over 70% of sentences imposed in the Second Circuit were below the Guidelines range, as
compared to approximately 50% nationally.  *See* U.S. Sentencing Comm'n, 2015 Sourcebook of
Federal Sentencing Statistics, Comparison of Sentence Imposed and Position Relative to the
Guideline Range by Circuit (Tbl. N-2) (2015), http://www.ussc.gov/sites/default/files/pdf/
research-and-publications/annual-reports-and-sourcebooks/2015/TableN-2.pdf.

received payments, under a subsidy program for low-income families, for children who did not actually attend.  *See id.* at 3-4; *see also* Sentencing Tr. at 10:15-20.  Judge Pauley imposed a sentence well below the Guidelines range of 24 to 30 months' imprisonment despite the fact that the government publicly touted Grushko's conduct to be part of a "Massive Day Care Fraud and Bribery Scheme"[43] and despite Judge Pauley's conclusion that she committed a "grave offense" that "hurts the most vulnerable segment of our society, low-income children from families who need childcare" and "corrupts the whole process of government."  Sentencing Tr. at 10:3-23.

In *United States v. Smith*, No. 08 Cr. 390 (BSJ) (S.D.N.Y.), the Honorable Barbara S. Jones imposed a sentence, after trial, of 15 months' imprisonment, which varied from the Guidelines range of 27 to 33 months' imprisonment she adopted.  *See* Sentencing Tr. at 29:1-3, 30:14-16, Feb. 11, 2010.  According to the government, it was proven at trial that, over at least a four-year period, the defendant, an employee of the New York City Department of Education's Office of Pupil Transportation, took cash bribes on dozens of occasions, totaling at least $26,500, from three different bus companies.  *See* Gov't Sentencing Mem. at 2-3, 5-6, Feb. 9, 2010, ECF No. 128.[44]  In exchange, he awarded the companies contracts for field trips or payments for trips that had never occurred.  *See id.* at 2-3.  The Government estimated the loss to the Department of Education resulting from the scheme of Smith and his co-defendants to be around $1,000,000.  *See* Sentencing Tr. at 21:9-12.

Sentences imposed in a very prominent and recent bribery prosecution in this District, in the cases of former New York State Assembly Senate Majority leader Dean Skelos and his son

---

[43]   *See* Press Release, U.S. Attorney's Office, S.D.N.Y., Manhattan U.S. Attorney Charges 11 With Operating Massive Day Care Fraud And Bribery Scheme, https://www.justice.gov/archive/usao/nys/pressreleases/August10/operationpaycaretakedownpr.pdf.

[44]   *See also* Sentencing Tr. at 4:7-25, 21:6-9, 22:9-21 (agreeing on lower bribe amount of $21,500 for sentencing purposes).

Adam Skelos, also clearly demonstrate that for Ms. Yan to receive a sentence within the
Guidelines range of 70 to 87 months' imprisonment would substantially overstate the gravity of
her crime.  In the *Skelos* prosecution, the Honorable Kimba M. Wood imposed sentences of 60
months' imprisonment for the former State Senator, and 78 months' imprisonment for his son,
following a four-week trial.  *See* Sentencing Tr. at 57:10-13, 75:17-19, *United States v. Skelos*,
15 Cr. 317 (KMW) (S.D.N.Y. May 12, 2016).[45]   Both were convicted of pressuring companies,
over more than four years, to make around $700,000 in payments to Adam Skelos in exchange
for father Dean Skelos taking action to enact legislation benefitting the companies.  *See* Gov't
Sentencing Mem. at 6-10, Apr. 4, 2016, ECF No. 173; *see also* Sentencing Tr. at 53:11-15,
55:10-12.  The defendants also enriched themselves in an amount of at least $334,000.  *See*
Gov't Sentencing Mem. at 10; Sentencing Tr. at 59:11-14.  Judge Wood commented at
sentencing to the Skelos' that their crimes "were more egregious than most, with the exception of
Sheldon Silver," and caused "immeasurable damage to New Yorkers' confidence in the integrity
of their government."  Sentencing Tr. at 55:16-18, 56:22-23.  She called the "cynicism" with
which Adam Skelos abused his father's power "appalling" and noted that he "appeared to have
no moral compass."  Sentencing Tr. at 73:22-74:2.

Obviously there would be a huge and unfair disparity were Ms. Yan—who had a
rudimentary understanding of the ethical and legal environment and succeeded in achieving
nothing by channeling payments—to be punished for her foolishness and vanity on the same
scale as a former State Senator who falsely denied violating his oath of office by trading

---

[45] These sentences, too, were well below the applicable Guidelines ranges advocated by
the government of 121 to 151 months for Adam Skelos and 151 to 188 months for Dean Skelos.
Sentencing Tr. at 53:16-18, 72:3-5.

influence for money, or as the Senator's son, who similarly failed to take responsibility for exploiting his father's position for his own enrichment.

In sum, the Guidelines range to which the parties agreed is the result of applying the "blunt instrument" of Section 2C1.1.  *See* U.S.S.G. § 2C1.1.  Even considered in isolation, that should be deemed to substantially overstate the appropriate sentence, based on the totality of the circumstances of Ms. Yan's offense, and the comparison of the circumstances of her case with those of other bribery cases in this District.

### D.     The Sentence Sufficient To Serve the Purposes of Punishment

Section 3553(a)(2) requires that the sentence be "sufficient, but not greater than necessary":

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

As demonstrated in the prior section, the only Section 3553(a) factor that suggests a sentence of multiple years or more is an advisory Guidelines range that itself substantially overstates the gravity of Ms. Yan's offense.  A full consideration of all the Section 3553(a)(2) factors establishes that the sentence the Court is required to impose—the sentence "not greater than necessary" to comply with the purposes of sentencing—would minimize substantially, if not forgo, a term of incarceration.

A consideration of "just punishment" should take into consideration, at the threshold, the punishment that has been imposed on Ms. Yan already.  Certainly for a person who has never

been arrested or imprisoned, it was a life-altering "shock treatment" for Ms. Yan to be handcuffed in front of her husband and led away by agents of the Federal Bureau of Investigation and to be called as a criminal defendant in Court proceedings.  Thereafter, she spent more than four weeks in a federal prison, and upon release, for the last eight months, has been confined with limited exceptions to a studio apartment while wearing an ankle bracelet.  The toll that the anxiety and seclusion have taken on Ms. Yan, as described above, has been considerable.  Ms. Yan's distress was sufficiently pronounced that the Pre-Trial Services Office took action, and Ms. Yan's current depressed and anxious state has been noted by the health care professionals to whom that Office referred her and under whose care Ms. Yan remains. [46]

As also referenced above, it is difficult to overstate the special punishment that comes from having been shamed so publicly, given the profile of this case.  Here and in China and elsewhere, Ms. Yan has forever been branded a felon, a criminal.  One of the reasons that Ms. Yan is compelled to implore the Court to weigh the distinctions that might exist between the culpability of herself and Mr. Ashe or Ng Lap Seng or the Chinese executives who have not been prosecuted is that those differences will matter little in the forum of public opinion.  That she "fell from grace" in the eyes of her family and friends, after having worked so hard in life to demonstrate her worthiness, has been crushing for Ms. Yan.  The additional measure of punishment that has come with being disgraced in public—both for herself and her loved ones— has made the hardship even more difficult for Ms. Yan to bear.  As just one example, it was

---

[46] The statement made by the family of Mr. Ashe that before his recent passing he had suffered "an inordinate level of stress" and had collapsed and become unresponsive twice, this past April, before his recent death is a reminder of the punishing circumstances of being arrested, charged, and disgraced.  *See* Statement from the Family of H.E. John William Ashe (June 24, 2016), *available at* http://antiguaobserver.com/wp-content/uploads/2016/06/June-24-FAMILY-STATEMENT-ON-THE-PASSING-OF-AMBASSSADOR-ASHE.pdf.

excruciating to Ms. Yan that her daughter Victoria was only able to accompany her to her plea hearing at the risk of being photographed in her company as she entered or left the courthouse.

The aims of promoting respect for the law and deterrence—as important as they are— also do not rely in this case on imposing a term of incarceration upon Ms. Yan. As to these factors, too, the public attention that the prosecution has received should be deemed to weigh in Ms. Yan's favor. It is undeniable that already a very strong and unambiguous message has been sent to the world, by the world media, that to the extent there was any confusion, bribery of international officials, whether by actors here or abroad, is illegal and will be prosecuted and punished.

Perhaps more fundamentally, Ms. Yan has done what she can to promote that message herself by taking full and prompt responsibility for her crime. Ms. Yan pleaded guilty early in the case, taking the decision to stand before the Court to admit her guilt before any co-defendant other than Ms. Piao. Ms. Yan then stated in her own words, with the media inevitably present, her acknowledgement of her guilt. She has exposed herself to a considerable prison term. In admitting her crime, within months of being charged, Ms. Yan enabled prosecutors to effectively close one half of the charged case and minimize expending further investigative or prosecutorial resources on her case or the wing of the bribery scheme that involved her and Ms. Piao.

Ms. Yan's acceptance of responsibility is also perhaps unique in the case. Mr. Ashe, despite being the leader of the bribery scheme, was never charged with bribery, only tax evasion. The government's apparent concession to the immunity enjoyed by Mr. Ashe, it is important to note, is not a statement that Mr. Ashe never committed bribery but merely an acknowledgement that he could not be punished for doing so. Mr. Ashe's colleagues in the Antiguan government, who pocketed the bribe money with Mr. Ashe, have denied that there was any wrongdoing.

They will likely never be held to account.  Nor will the Chinese "co-conspirators"—as the government characterizes them—apparently ever face justice.

In short, even fully appreciating the importance of deterrence and message-sending, Ms. Yan has done everything in her own power to enhance and disseminate that message, in stark contrast to others who bear responsibility that is equal, at the very least.  Any additional term of incarceration carries the risk of imposing unfairly on her disproportionately the weight of serving as an example, particularly in light of the other mitigating circumstances present in her case.

The final Section 3553(a)(2) factors also weigh against any significant further term of incarceration.  There is no need to protect the public from any further crimes by Ms. Yan.  She has learned extremely painful lessons, harbors paralyzing remorse, and will never commit another crime.  Ms. Yan plans to retire from any business dealings or efforts altogether.  As her husband has put it, "Sheri will never do business again" and, were the Court to allow it, the couple "simply hope to enjoy our retirement together, in the company of each other and, importantly, her parents."  Ex. 1 (Letter of Roger T. Uren).

At the age of 60, Ms. Yan's own objectives for her future, were she to be granted liberty for any of her remaining active years, are extremely modest.  She intends to support herself by helping her father to sell his artwork.[47]  Her primary concern is to spend whatever time she can caring for her ailing parents, who still live in China.  Ms. Yan's father is nearly blind from macular degeneration, and her mother suffers from heart disease, and thus the elderly couple are not able to travel to the United States.  Many of the letters written in support of Ms. Yan call special attention to the bond between Ms. Yan and her parents and the care-taking role that Ms.

---

[47]   *See* Ex. 1 (Letter of Sheri Yan) ("What I want is to focus on promoting my father's paintings to support my life.").

Yan has always played in their lives.[48]  As Mr. Uren has put it, "the responsibility that is most important to Sheri, and which she has taken incredibly seriously, is to care for her parents."  Ex. 1 (Letter of Roger T. Uren).

Since she was released from prison, Ms. Yan has talked by FaceTime with her parents daily.  Ms. Yan's daughter Victoria has described that given the closeness of her mother to her grandparents and her grandparents' condition, the notion that her grandparents may never see or touch Ms. Yan again is heartbreaking to her.  She has written:  "My grandpa and my grandma have seen so much pain in their lives, and for their final years to be spent yearning for a daughter they cannot see and cannot speak to except through a machine is a thought that ruins me."  Ex. 1 (Letter of Victoria Uren).  Ms. Yan has stated that were the Court to grant her leniency, "I will use my entire heart to take care of [my parents] and make up for the thirty years I spent running after work and spending less time with them."  Ex. 1 (Letter of Sheri Yan).   In their letter to the Court, Ms. Yan's parents have explained that they have "reached the fragile years of [their] extinguishing lives," that they are "worrying day and night," and that their one wish is to be able to see their daughter while they are alive.  Ex. 1 (Letter of Zhen Yan and Yingmin Zhu).  Ms. Yan's parents have asked that the Court, whom they view to be the representative of "the fairness and kindness of America,"  "allow our daughter to come back sooner rather than later, so that in our twilight years, she can still take care of our livelihood and fulfil[l] her filial heart's desire."  *Id.*

Aside from caring for her family, the only activity that Ms. Yan desires to continue, if she has the chance, and from wherever she is, is the volunteer work that she began performing in

---

[48]    *See, e.g.*, Ex. 1 (Letter of Victoria Uren); (Letter of Geling Yan); (Letter of Yabin Yu); (Letter of Lesley Pang); (Letter of Bruce Dover); (Letter of Roger T. Uren); (Letter of Sharon Content).

January of this year at Children of Promise, New York ("CPNYC").  In part because of her despair and anxiety at being restricted to her apartment, with nothing to occupy her mind except her own situation, Ms. Yan requested permission from the Pre-Trial Services Office to leave her home for several hours, two to three times a week, to travel to CPNYC, which is based in the Bedford-Stuyvesant neighborhood in Brooklyn and provides educational opportunities and therapeutic support to children of incarcerated parents.[49]  As described by its founder, Sharon Content, CPNYC strives to "break the cycle of intergenerational involvement in the criminal justice system."  Ex. 1 (Letter of Sharon Content).  After her initial visit, Ms. Yan quickly became active in supporting children's art classes at CPNYC, and her daughter Victoria also volunteered, including by photographing the children and their art.  Ms. Yan and her daughter together prepared a book showcasing the children's art, performances, and writing, called "Art from the Heart," which has just been published.  *See* Ex. 4, Parts A-D (copy of "Art from the Heart").  CPNYC now plans to publish "Art from the Heart" twice a year.  Ms. Content has written in her letter to the Court that "in a short . . . period of time," Ms. Yan and Victoria have "become some of our strongest advocates and critical members of the CPNYC team" and that Ms. Content regards Ms. Yan as a "true friend" who is "very special in that she understands the mission of my organization."  Ex. 1 (Letter of Sharon Content).

It is also Ms. Content who has raised a central point in the consideration of the sentence sufficient in Ms. Yan's case to serve the purposes of sentencing.  Ms. Content's observations and interactions over the last six months have led her to conclude that Ms. Yan "accepts full responsibility" for her crime and "wholeheartedly regrets" it, and that Ms. Yan has "committed herself to rectifying the situation as best she can."  *Id.*  In Ms. Content's view, because Ms. Yan

---

[49]  *See* About Us, Children of Promise, NYC, http://www.cpnyc.org/about-us/ (last visited July 10, 2016).

"has so much to offer society as demonstrated in the love, generosity and courage she has displayed over the past few months" for Ms. Yan to "serv[e] time in prison would be detrimental to all concerned." *Id.*

Today, there is a growing call for the application of more decent and intelligent sentencing and incarceration principles—principles that would reserve prison cells for defendants who either need to be separated from society for society's protection or those who would learn lessons or benefit from incarceration.[50]  Applying such principles to Ms. Yan's case easily yields the conclusion that there is little point to returning Ms. Yan to waste in prison. There is no "educational" or "other correctional treatment" that will benefit her there, and society will not be bettered by removing her from it.

In sum, taking the totality of circumstances relevant in Ms. Yan's case, the sentence sufficient, but not greater than necessary, to serve the objectives of sentencing is certainly nothing close to even the low end of the Guidelines range.  If Ms. Yan is returned to incarceration, her term there should be sufficiently brief that she is not deprived of the ability to

---

[50] *See, e.g.*, U.S. Sentencing Comm'n, *Alternative Sentencing in the Federal Criminal Justice System*, at 1, 20 (Jan. 2009), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20090206_Alternatives.pdf  (observing that "[i]ncreasingly, criminal justice professionals have argued that dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders" and that alternatives to incarceration "provide those offenders opportunities by diverting them from prison (or reducing time spent in prison) and into programs providing the life skills and treatment necessary to become law-abiding and productive members of society"); Hon. Raymond Dearie, *Retool Mandatory Sentences*, New York Law Journal (June 24, 2016), http://www.newyorklawjournal.com/id=1202760853093/Retool-Mandatory-Sentences?mcode= 0&curindex=0&curpage=1 (advocating reserving prison cells "for the violent and those who victimize irreparably," and thinking seriously "about the wisdom and need of incarcerating non-violent first offenders whose only real victims are themselves and for whom leniency may be the first break they have ever had").

care for her family, including her elderly parents, or to make her amends to society, while living

in it.

### E.      The Types of Sentences Available

In the post-*Booker* era, it is clear that even a departure to the sentence of time served is a

fully available sentence.  In addition, 18 U.S.C. § 3553(a)(3) "directs the judge to consider

sentences other than imprisonment."  *Gall v. United States*, 552 U.S. 38, 59 (2007).

### F.      The Need To Avoid Disparate Penalties

The manner in which the need to avoid imposing a sentence on Ms. Yan that would

create unwarranted disparities vis-à-vis sentences imposed in other bribery cases has already

been discussed.  *See* discussion *supra* at Section C.  In short, any sentence near the Guidelines

range would fail to take into account that the value of the bribes, which is the main determinant

of the range, is overstating the nature and circumstances of Ms. Yan's offense and failing to take

adequately into account Ms. Yan's nature and characteristics as well.

Perhaps even more fundamental are the unwarranted disparities that would exist among

the co-schemers in Ms. Yan's case were she to receive any sentence that is for more than a

minimal term.  As described above, the bribe-givers in China and the takers of the bribe money

in Antigua will likely never face justice.  The sentence of Ms. Piao, who entered into a

cooperation agreement, cannot now be predicted.  But most fundamentally, Mr. Ashe, who was

himself the person who held the official position, and who led the scheme and benefitted

handsomely from it, was only ever charged with tax crimes that, upon a guilty plea, would likely

have resulted in a Guidelines range of 30 to 37 months' imprisonment.[51]

---

[51] While the Guidelines calculation cannot be known for certain, assuming that Mr. Ashe
was held accountable for a tax loss of more than $550,000 but not more than $1.5 million, under
U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1(H), Mr. Ashe's base offense level would have been 20, and a

The likely punishment to which Mr. Ashe would have been subject, had he lived, reinforces the unfairness that would result if Ms. Yan were given any sentence that exceeded a minimal term.  The blame will never equally be shared among Ms. Yan and her co-schemers.  In addition, given their relative culpabilities, it cannot be squared with fairness for Ms. Yan to receive a sentence near to the sentence of several years that Mr. Ashe might have received, had he not passed away.

###### G.     The Need to Provide Restitution

The Probation Department has noted that "due to the complicated nature of determining whether monetary restitution is warranted, as well as a restitution amount, we believe that restitution is not applicable in this case." PSR ¶ 61.

Ms. Yan nonetheless agreed, as part of her plea agreement, to forfeit $300,000 as property traceable to the commission of her offense or property that is a substitute for such property.  *See* Plea Agreement at 2; *see also* PSR ¶ 154.  Ms. Yan is planning to satisfy the $300,000 judgment from proceeds of the sale of an apartment that she owns in Arlington, Virginia.  The only impediment to the sale to date has been the fact that the apartment was posted as security for Ms. Yan's appearance bond.  As soon as the property is released, Ms. Yan and her husband can take steps to sell the apartment to raise the $300,000.

---

two-level upward adjustment for failing to identify correctly a source of income from criminal activity exceeding $10,000 in any one year would have applied.  *See* U.S.S.G. § 2T1.1(b)(1).  Assuming a three-level deduction for acceptance of responsibility from the adjusted offense level of 22, *see id.* § 3E1.1(a), Mr. Ashe's Guidelines range for the total offense level of 19, at Criminal History Category I, would have been 30 to 37 months' imprisonment.  *See id.* Part A, Sentencing Table.

## CONCLUSION

Ms. Yan's friends and family have attested that Ms. Yan is a kind, giving, and honest person.  They serve as her supporters and support system.  Ms. Yan has taken full responsibility for her crime, has been crushed by the consequences, and desires most of all to re-join her parents in the limited time they have left.  For the foregoing reasons, we respectfully request that the Court impose a minimal term of incarceration, if any at all.

DATED:   New York, New York                Respectfully submitted,
          July 11, 2016


By: */s/ Christine H. Chung*
    QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
    Christine H. Chung
    Samantha Gillespie
    51 Madison Avenue, 22nd Floor
    New York, New York 10010
    (212) 849-7000

    CLAYMAN & ROSENBERG LLP
    Isabelle A. Kirshner
    305 Madison Avenue, Suite 1301
    New York, New York 10165
    (212) 922-1080

    *Attorneys for Defendant Shiwei Yan*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the foregoing document with the

Clerk of the Court by using the CM/ECF system and that it is available for viewing and

downloading from the ECF system. The CM/ECF system will provide service of such filing via

Notice of Electronic Filing to counsel for the United States of America.

DATED:   New York, New York                  Respectfully submitted,
         July 11, 2016


                                   By:  */s/Christine H. Chung*
                                      QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP
                                      Christine H. Chung
                                      51 Madison Avenue, 22nd Floor
                                      New York, New York 10010
                                      (212) 849-7000